IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHAWN LYNN PROCTOR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-13-1485 |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 18), and Memorandum in Support (Document No.18-1), and Defendant's Motion for Summary Judgment (Document No.16) and Memorandum in Support (Document No. 16-1). After considering the cross- motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 16) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 18) is DENIED, and the decision of the Commissioner is AFFIRMED.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on September 25, 2013. (Document No. 9).

## I. Introduction

Plaintiff, Shawn Lynn Procter (Procter") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") payments. Proctor argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, John D. Sullivan, committed errors of law when he found that Proctor was not disabled. Proctor argues that she has been disabled since October 26, 2007, due to problems arising from Phlebitis, a Factor V Leiden Mutation, Deep Vein Thrombosis, Obesity and Hepatitis C. According to Proctor, the ALJ erred in appearing to accept the opinions of the non-examining state physicians over that of the medical expert or her treating physician. She further argues that the ALJ failed to properly evaluate her credibility. Lastly, Proctor argues the ALJ erred in failing to show there is other work in the national economy that she can perform. Proctor argues that the ALJ relied on flawed vocational expert testimony because it was premised on the ALJ's residual functional capacity (RFC) finding that was not supported by the record. Proctor seeks an order reversing the ALJ's decision and awarding benefits, or in the alternative, remanding her claim for further consideration. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Proctor was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II. Administrative Proceedings

On September 23, 2009, Proctor protectively filed for DIB and SSI claiming she has been disabled since October 26, 2007. (Tr. 70-72, 799-808). The Social Security Administration denied her applications at the initial and reconsideration stages. (Tr.51-69). Proctor then requested a

hearing before an ALJ. (Tr. 50). The Social Security Administration granted her request, and the ALJ held a hearing on October 14, 2011. (Tr. 831-880). On December 6, 2011, the ALJ issued his decision finding Proctor not disabled. (Tr.15-25). In his decision, the ALJ found that Proctor was not disabled at any time from October 26, 2007, through the date he issued his decision.

Proctor sought review by the Appeals Council of the ALJ's adverse decision. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering Proctor's contentions, including the letter from Dr. Charles Addington dated December 14, 2011 (Tr. 815-819), and medical records from St. Luke's Hospital (Tr. 820–830), in light of the applicable regulations and evidence, the Appeals Council, on December 21, 2011, concluded that there was no basis upon which to grant Proctor's request for review. (Tr. 1-4). The ALJ's findings and decision thus became final.

Proctor has timely filed her appeal of the ALJ's decision. The Commissioner has filed a Motion for Summary Judgment (Document No. 16). Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 18).This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 880. (Document No. 14). There is no dispute as to the facts contained therein.

### III. Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits, is only "to [determine] (1) whether

substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d

1137 (5th Cir. 1973)).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not

disabled" must be made; and

5. If the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Id.*, at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in his December 6, 2011, decision that Proctor was not disabled. In particular, the ALJ determined that Proctor met the insured status requirements of the Social Security Act through June 30, 2011, and that she had not engaged in substantial gainful activity since October 26, 2007 (step one); that Proctor's phlebitis and thrombophlebitis, lymphedema, obesity and hepatitis C are severe impairments (step two); that Proctor did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 of the regulations. The ALJ took into account obesity as an aggravating factor for other impairments (step three); based on the record, as well as the testimony of Dr. Stephen Goldstein and of Proctor, the ALJ found that Proctor had the RFC to perform a less than a full range of light work. In particular, the ALJ found that "she can lift and carry 20 lbs. occasionally and 10 lbs. frequently, with pushing and pulling the same, and she can sit for 6 hours in the usual work day – but she can stand and can walk for 3 to 4 hours in the usual work day, instead of the more familiar

6 hours, all with normal breaks.  The claimant has non-exertional limitations, in that she is limited to occasional postural maneuvers, that is, she can occasionally climb stairs and ramps (but never ropes, ladders or scaffolds), and can occasionally crouch or crawl, bend, kneel, stoop and balance; she must be allowed to sit or stand during the work day, changing position for a minute or so every hour; and she cannot work exposed to concentrated airborne pollutants, such as dusts, fumes, odors and gasses, and environments with poor ventilation; and she must avoid work exposed to extremes of hot and cold." (Tr. 21-22).  The ALJ next found that Proctor could not perform her past relevant work (step four).  Finally, the ALJ found that based on Proctor's age, education, work experience, RFC, and the testimony of a vocational expert, that there are jobs that exist in significant numbers that Proctor can perform such as a small products assembler, a copy machine operator, and an office helper, and she was not disabled within the meaning of the Act (step five).  As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age.  *Wren*, 925 F.2d at 126.

**V.  Discussion**

The objective medical evidence shows that Proctor has been treated for Factor V Laiden deficiency.  She has hepatitis C.  The records reveal that she was on interferon therapy in 2003 and 2004.  After her funding ran out, Proctor sought no further treatment.  Proctor is obese.  She testified that she is 5'3" tall and weights 318 pounds.  (Tr. 838).

By history, the records indicate that Proctor reported being treated for myesthema gravis and

that the condition resolved. Likewise, she was treated for incontinence. (Tr. 252-253, 663-674). Proctor was also treated for carpal tunnel syndrome. She successfully underwent right carpal tunnel release surgery on August 1, 2008. (Tr. 228-230, 239-249, 651, 658-661).

Most of the medical records relate to Proctor's treatment for Factor V Laiden deficiency in Lubbock, Texas and in Houston, Texas. On October 24, 2008, Proctor sought medical attention at the ER for pain in her right leg. (Tr. 216-227). She reported that she had not been taking her "meds" and had been on a "long car trip Houston and back." (Tr. 217). She was diagnosed with thrombophlebitis of the lower extremity and discharged as "improved and stable." (Tr. 220).

On October 29, 2008, Proctor went to the ER complaining of right leg pain. She was diagnosed with thrombophlebitis. (Tr. 206-214).

On November 5, 2008, Proctor went to the ER complaining that her lower leg was swollen. She had a superficial thrombophlebitis and was given Coumadin therapy. (Tr. 199-203, 215).

Proctor went to the ER on February 4, 2009, complaining of a leg edema. She was given Lovenox. (Tr. 189-194). The next day, she was hospitalized for a right saphenofemoral thrombophlebitis and Factor V deficiency and given Coumadin therapy. She was discharged on February 9. (Tr. 177-183).

On March 2, 2009, Proctor was sent to the ER because of an abnormal coagulation lab test result. She reported taking extra doses of Coumdin. (Tr. 169-176).

Proctor was treated at the ER on April 21, 2009. (Tr. 164-166). Proctor reported that she had not been taking Coumadin as prescribed and was experiencing right ankle pain and swelling. Diagnostic tests revealed she had a clot in the distal greater saphenous vein. (*Id.*).

On May 5, 2009, Proctor experienced "acute right leg pain and swelling" after she fell off her porch. She sought treatment at the ER. (Tr. 314-324).

On May 27, 2009, Proctor went to the ER complaining of ankle pain. Tests revealed that she had a lower extremity deep venous thrombosis. She was hospitalized and given anti-coagulation therapy. (Tr. 307-308).

Proctor reported to the ER on June 5, 2009, and was transferred to the University Medical Center. She was hospitalized from June 5 to June 16, 2009. (Tr. 267-276, 294, 306). Proctor was treated for a right lower deep vein thrombosis. Proctor reported being off her medications for a month. (Tr. 301). The records indicate that her "medical noncompliance [was] discussed" and "she was properly anti-coagulated." (Tr. 268) On June 24, 2009, Proctor had her first appointment with Dr. D'Cunha, a specialist in coagulation disorders. (Tr. 694-696). She had been referred by Dr. Santana. Dr. D'Cunha prescribed Lovenox.

On July 13, 2009, Proctor sought medical care at the ER for right leg swelling. She stated she had not been taking Lovenox and had driven from Houston back to Lubbock in a day. (Tr. 278-286). On July 15, 2009, Dr. D'Cunha noted problems with the Medicaid guidelines and the number of syringes per month that are covered for Lovenox. (Tr. 695) He also discussed weight management with Proctor because it would "improve circulation." (Tr. 696). On July 16, 2009, Proctor was seen by Dr. D'Cunha for a routine office visit. (Tr. 691-692). According to the note, Proctor "refuses to dose properly on Lovenox" and "I have discussed with the patient to avoid prolonged travel and if she does to stop and walk every hour." She was encouraged to lose weight and stop smoking. (Tr. 692).

Proctor went to the Family Medicine Office on July 20, 2009, and was instructed to go to the ER based on her complaints of shortness of breath. (Tr. 289-293, 366). Because her coagulation levels were not therapeutic she was hospitalized from July 20 to July 30, 2009, for problems relating to Factor V deficiency. (Tr. 257-266). Proctor reported that she had been "on and off Lovenox for

past 4 weeks and was not on Coudadin." (Tr. 258). The records show that she reported difficulty affording Lovenox, which had been prescribed by Dr. D'Cunha. Previously, Proctor had been on Coumadin. (Tr. 262). Vascular tests revealed no acute deep vein thrombosis. She had a small amount of residual thrombus in the right superficial femoral vein. (Tr. 261). The results of her physical exam showed she had a good muscle tone, full range of motion and was neurologically intact. The discharge records indicate that she was prescribed Coumadin because she could afford it. (Tr. 265).

Proctor went to the ER on August 1, 2009, complaining of right leg pain. She reported she had discontinued Lovenox because it was too expensive and had self dosed on Coumadin. She was discharged with a diagnosis of phlebitis. (Tr. 477-481).

Proctor went to the ER on August 7, 2009, complaining of upper right arm. Her PICC line was infected so she was admitted to the hospital. She was hospitalized from August 7, 2009 to August 11, 2009. (Tr. 448-452, 465-468, 482-483).

Proctor was hospitalized from September 14, 2009 to September 19, 2009, at the University Medical Center in Lubbock, Texas. (Tr. 435-441, 459-464). She was subtherapeutic on her anticoagulant so she was admitted for Coumadin therapy. Testing revealed an acute thrombus from the midthigh to the mid calf in the greater saphenous vein. (Tr. 437). Treating notes reveal that "the patient did continue to be drug seeking for pain medication, and these were limited. However, it did appear that the patient may have been supplied with outside medications from her family." (Tr. 435). Proctor became dissatisfied with the care provided by Dr. D'Cunha. She did not like his recommendation that she be put on Lovenox for the rest of her life. The treatment note indicates that it is "too expensive. She is on Medicaid" and currently takes Coumadin. (Tr. 689-690). On March 10, 2010, Proctor was seen at the Southwest Cancer Treatment and Research Center for "Factor V

Leiden mutation with recurrent deep vein thromboses, currently on Coumadin therapy." The note indicates that Proctor was to resume Coumadin therapy. (Tr. 681). (Tr. 679-680).

On April 22, 2010, Proctor complained of a right forearm abscess. She had a full range of motion in her extremities, her chest x-ray was clear and foot x-ray showed no fractures. (Tr. 549-556). Because of the abscess, she was hospitalized from April 22, to April 28, 2010. (Tr. 628-638). On May 1, 2010, Proctor went to the ER complaining of pain on right upper arm. The nursing triage note states that "no lesions observed." (Tr. 531-533, 627). She went to the ER on June 1, 2010, complaining of left toe pain. (Tr. 611-617). Proctor went to the ER on June 10, 2010, complaining of shortness of breath. Her chest x-ray was clear. However, she was hospitalized for Coumadin toxicity. She was discharged on June 12, 2010. (Tr. 577-610, 618-622). She developed pneumonia while hospitalized which delayed her discharge. Proctor returned to the ER on July 10, 2011, complaining of pain and swelling in her left leg. She reported that she had not taken her medicine for five days. She was diagnosed with thrombophlebilitis of the lower extremity saphenous vein thrombosis and discharged the same day as stable. (Tr. 719-726).

The medical records show that besides the ER, and hospitalizations, Proctor was treated at the Family Medicine Office of the Wolfforth Community Health Center by Charles Addington, D.O., and his physician assistant, Johnny Turner. All of the records were written by Johnny Turner, P.A. and it appears that Proctor was actually treated by Johnny Turner not Dr. Addington. Most of the treatment notes were for routine medication refills. Also, the results of her examinations were normal. The exception being when she reported symptoms associated with her coagulation disorder and she was sent to the ER. (Tr. 351-433). For instance, on February 13, 2009, Proctor's exam was normal and she was encouraged to lose weight. (Tr. 367-369). Johnny Turner wrote: "compliance problems with medications, with a treatment program, with weight management and does not follow

up as directed for lab test." (Tr. 367). On September 1, 2009, Proctor was seen for "general concerns." (Tr. 363-365). Her exam was normal. Johnny Turner, P.A. wrote that she had "compliance problems with diet, with exercise program, with medications and with tobacco cessation." (Tr. 363). On September 23, 2009, Proctor complained of ankle pain that was made "worse by activities of daily living, ambulation, and prolonged standing." The note indicates that Proctor was "shaking a lot." (Tr. 359-363). On October 27, 2009, Proctor was seen by Johnny Turner, P.A. for a bump on her heel. His exam notes indicates that she had a normal range of motion. (Tr. 351-353). Proctor was seen on October 16, 2009, for left foot pain and a cough. (Tr. 355). On December 16, 2009, she was seen for cellulitis and a dry cough. (Tr. 686-688). Proctor was seen on February 3, 8, 10, 12,16, and 24, 2010, for wound care related to her breast infection. (Tr. 505-52, 683-857). On March 4, 2010, Proctor sought treatment for a cough. (Tr. 501-504). Proctor was next seen on March 23, 2010, seeking treatment for a sore throat and cough. (Tr. 491-493). Proctor was seen on April 16, 2010, for a skin lesion on her right hand and thumb. (Tr. 494-496). On April 22, 2010, Proctor sought medical care for a laceration on her foot. She reported she fell a week ago and cut her foot on a glass shard. (Tr. 528-530). On April 29, 2010, and on May 4, 2010, Proctor was seen for wound management. (Tr. 485-490). Proctor was next seen on May 24, 2010, for repeat lab work. (Tr. 714-717). She was seen on June 3, 2010, for a hospital follow up, and for a sore throat and swelling in her right leg. (Tr. 710-713).

Proctor was seen nearly a year later on July 6, 2011. (Tr. 728-730). She reported the had been out of town for a year and was back for a few months. On August 20, 2011, Johnny Turner, P.A. completed a form "Treating Physician Opinion of Patient Limitations." (Tr. 737). The form indicates that Proctor had been a patient since May 15, 2008. Proctor's pain was described as "marked", that her pain was increased by physical activity. With respect to Proctor's ability to work,

the form states that Proctor could work if sitting but would miss work three days a month. (Id.). In a letter dated December 14, 2011, Dr. Charles Addington, D.O, Supervising Doctor of Johnny Turner, PA, wrote: "due to these conditions Ms. Proctor deals with marked pain on a daily basis. Physical activity would increase this pain and would affect her ability to work." (Tr. 815).

Proctor moved to Houston in 2010. The medical records show that she received medication refills at the St. Michael Medical Clinic on August 26, 2010 (Tr. 574-75), October 5, 2010 (Tr. 573), November 1, 2010 (Tr. 572), December 17, 2010 (Tr. 571), February 15, 2011 (Tr. 569), March 16, 2011 (Tr. 567), April 17, 2011 (Tr. 570), June 8, 2011 (Tr. 734), June 20, 2011 (Tr. 733), and July 25, 2011 (Tr. 732).

Proctor went to St. Luke's The Woodlands Hospital on August 14, 2010. (Tr. 794-796). Proctor stated she had been moving furniture and hurt her leg. She also wanted refills of her pain medication. (Tr. 797). On August 20, 2010, Proctor went back to St. Luke's The Woodlands complaining of leg pain. The record indicates that she had been there six days before. She requested that she be transferred to the Methodist Willowbrook Hospital. Per her request, she was transferred to the Methodist Willowbrook Hospital. She was hospitalized from August 20, 2010 to August 22, 2010, due to a Coumadin overdose. (Tr. 768, 784-792). The treatment notes indicate that "the patient kept asking for hydrocodone through the hospital course." (Tr. 768).

On September 25, 2010, Proctor went to St. Luke's The Woodland Hospital complaining of right calf pain. She requested to be transferred to Methodist Willowbrook Hospital. (Tr. 778-783). There, she reported not taking Coumadin for two weeks. There was no evidence of a deep vein thrombosis in either lower extremity and she was discharged to resume normal activity. (Tr. 761-765).

On October 24, 2010, Proctor went to St. Luke's The Woodlands Hospital. (Tr. 771-777).

She reported that she had tripped and twisted her ankle and she also had a cough. The medical records show that she had a steady gait (Tr. 772), and an x-ray of the ankle showed no fracture or dislocation (Tr. 776). Proctor went to the ER at Methodist Willowbrook Hospital on October 29, 2010. (Tr. 743-760). She reported right leg pain. She was given a transfusion and discharged.

Proctor went to the ER at Methodist Willowbrook Hospital on November 13, 2010, complaining of leg swelling and requesting a "refill of my Narcos." Her examination was unremarkable and she was discharged with a diagnosis of muscle aching-myalgia. (Tr. 739-740). On December 28, 2011, Proctor went to the ER at St. Luke's Hospital at the Vintage. (Tr. 820-830). She complained of pain in her right leg. She reported that she had changed her Coumadin dose. (Tr. 823). A Doppler test revealed a chronic appearing peripheral partial deep vein thrombus of the right lower extremity above the knee. (Tr. 824).

On January 21, 2010, Terry Collier, M.D. a state agency disability determination unit physician completed a physical residual functional assessment. (Tr. 557-564). Dr. Collier opined that Proctor had no manipulative, visual, communicative, or environmental limitations. As for postural limitations, he opined that Proctor could occasionally climb ramps/stairs and a ladder/rope/scaffolds. He also found that she frequently could balance, stoop, kneel, crouch, and crawl. As for exertional limitations, Dr. Collier opined that Proctor could occasionally lift and/or carry twenty pounds, could frequently stand/or walk (with normal breaks) at least 2 hours in an 8-hour work day, could sit (with normal breaks) for a total of about 6 hours in an 8 hour work day, and could stand and walk four hours a day. Proctor was limited in her ability to push and/or pull. Overall, Dr. Collier found Proctor's "alleged limitations partially credible." (Tr. 564). A second disability determination unit physician, Laurence Ligon, M.D., concurred in Dr. Collier's RFC assessment. (Tr. 565).

At the October 4, 2011, hearing, Stephen Goldstein, M.D. testified. According to Dr. Goldstein, none of Proctor's impairments met a listing. (Tr. 863). Dr. Goldstein identified Proctor's main problem as complications from the Factor V Leiden mutation and recurrent deep venous thrombosis. (Tr. 862). Dr. Goldstein testified that this condition is typically controlled through medication but because of financial problems, Proctor had been non-compliant in taking her medications as prescribed, and had been non-compliant through her activities, i.e, moving furniture. (Tr. 863-864). Based on the record and Proctor's testimony, Dr. Goldstein opined that while Proctor is de-conditioned due to inactivity, with appropriate treatment, she could be at a limited range of light activities, and "could sustain 8 hours of activity a day for five days a week." (Tr. 867-868). Dr. Goldstein opined that Proctor could be on her feet two hours, then sit for 30 minutes and get up again. She could not sit for extended periods. He noted that Proctor had no postural limitations, but should avoid smoking, dust and fumes. (Tr. 863-864). According to Dr. Goldstein, Proctor had become de-conditioned from being in bed without any activities and being obese. Dr. Goldstein stated that Proctor could swim, build muscle strength, and that with this conditioning she could get her endurance back. He estimated this process might take two to three months. (Tr. 866-867).

Here, substantial evidence supports the ALJ's finding that Proctor's phlebitis and thrombophlebitis, lymphedema, obesity, and hepatitis C were severe impairments at step two, and that such impairments at step three, individually or in combination, did not meet or equal a listed impairment. In addition, substantial evidence supports the ALJ's finding that Proctor retained the RFC for less than the full range light work. The ALJ wrote:

> The claimant, I decide, can perform most of the exertional demands of light work, that is, she can lift and can carry 20 obs. occasionally and 10 lbs. frequently, with pushing and pulling the same, and she can sit for 6 hours in the usual work day – but she can stand and can walk for 3 to 4 hours in the usual work day, instead of the more familiar 6 hours, all with normal breaks. The claimant has non-exertional limitations, in that

she is limited to occasional postural maneuvers, that is, she can occasionally climb stairs and ramps (but never ropes, ladders or scaffolds), and can occasionally crouch and crawl, bend, kneel, stoop and balance; she must be allowed to sit or stand during the work day, changing position for a minute or so every hour; and she cannot work exposed to concentrated airborne pollutants, such as dusts, fumes, odors and gasses, and environments with poor ventilation; and she must avoid work exposed to extremes of hot and cold.  (Tr. 21-22).

Upon this record, the ALJ's RFC determination is consistent with Dr.Collier's and Dr. Ligon's RFC assessment, the testimony of the medical expert, Dr. Goldstein, and the medical records.  The ALJ, based on the totality of the evidence, concluded that Proctor could perform less than a full range of light work, and gave specific reasons in support of this determination.  This factor weighs in favor of the ALJ's decision.

## B.  Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight."  *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995)).  The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists.  *Id.*  "'[T]he Commissioner is free to reject the opinion of any physician when the

evidence supports a contrary conclusion.'" *Martinez*, 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809

F.2d 1054, 1057 (5th Cir. 1987)).   Further, regardless of the opinions and diagnoses of medical

sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64

F.3d at 176.

The Social Security Regulations provide a framework for the consideration of medical

opinions.  Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's

opinion must be based on:

> (1)      the physician's length of treatment of the claimant,
>
> (2)      the physician's frequency of examination,
>
> (3)      the nature and extent of the treatment relationship,
>
> (4)      the support of the physician's opinion afforded by the medical evidence of record,
>
> (5)      the consistency of the opinion with the record as a whole, and
>
> (6)      the specialization of the treating physician.

*Newton,* 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling

weight on the issue of disability, in most cases such opinions must at least be given considerable

deference. *Id.*  Again, the Social Security Regulations provide guidance on this point.  Social Security

Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg.34490 (July 2, 1996). With regard to the weight to be given "Residual Functional Capacity Assessments and Medical Source Statements," the Rule provides that "adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 ... providing appropriate explanations for accepting or rejecting such opinion." *Id.* "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton,* 292 F.3d at 455; *see also Cole ex. rel. Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so."). However, perfection in administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately. The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources.

Proctor contends the ALJ erred in appearing to accept the opinions of the non-examining state physicians over that of the medical expert or the treating physician. Proctor asserts that the ALJ did not mention Dr. Goldstein, the testifying Medical Expert or his opinion that Proctor was currently de-conditioned due to inactivity, which limited her to less than sedentary work. Proctor further argues that ALJ erred by not requesting that a consultative examination. Proctor contends that controlling weight should have been given the "Opinion of Patient Limitation" form completed by her treating physician Dr. Addington and by his physician assistant. The Commissioner responds that ALJ properly weighed the medical opinions and performed an analysis of the opinion evidence. According to the Commissioner, the ALJ summarized the medical evidence and performed a thorough analysis of Proctor's conditions. The Commissioner further argues that the ALJ's RFC is consistent with the

medical source opinions which showed Proctor could perform a limited range of light work.

With respect to the opinions and diagnoses of treating physicians and medical sources, the

ALJ wrote:

> In making this finding, I have considered the opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p. The claimant's physical residual functional capacity was evaluated for the state agency by Terry Collier, M.D., who wrote that she could perform nearly the full range of light work, with some of the postural activities available frequently, but other – climbing stairs and ramps, and ladders, scaffolds and ropes, only occasionally (Exh. C-8F, January 2010). In June 2010, Laurence Ligon, M.D., agreed (Exh. C-9F).

> The claimant, through her representative, has presented [a] medical statement of opinion ostensibly from a treating physician, Dr. Charles Addington, in which the author writes that the claimant has pains which are a factor in her life in a marked degree, and that her pains are increased by physical activity and that she will likely miss work 3 days per month because of her impairments – but that she is capable of sustained work on a full time basis (Exh. C-18F). To be fair, the maker of the statement circles the word sitting in the answer about sustaining full time work, so I consider the opinion to be that she can sustain sedentary work. This letter, however, is from Jimmy Turner, who is a physician's assistant, not a doctor (See Exh. C-16-F-2), so his opinion is not entitled to significant deference.

> I have also considered all the claimant's symptoms and the extent to which these symptoms can reasonable be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p.

> In her Function Report, the usual place for reporting symptoms, the claimant write that her legs swell, so that she cannot stand or sit at will, and that she cannot walk much at all – for example, she uses electric carts for grocery stopping – and that she has generally restricted activities (Exh. C-1E-48 et seq.); but she does not write of hurting or being short of breath or other symptoms, [a]s that term is used in Social Security disability proceedings. She also writes that her mind races, so that she does not sleep well, waking in the night. In a second Function Report, the claimant writes of difficulty getting out of bed, and had significantly difficult problems with moving. (Exh. C-1E-17 et seq.); and she does write that she is always in pain.

> In her testimony, the claimant said she is generally in pain – she rated her pain at 4 to 5 on a good day, though getting worse through the day, and at 7 to 8 on a bad day. She has Hydrocodone for pain, which makes her sleepy. She said she waked in the night because of pain, and has low energy. She says her leg swells from lymphedema, which I take to be a manifestation of her difficult circulation in her legs, that is, her

phlebitis. She testifies that she has to elevate her leg, and that her concentration is affected by her pain. She testified to significant difficulty getting around, needing help dealing with her leg, such as getting into pants and into the shower. She also reported being very emotional, with things getting on her nerves. She also testifies that she is not always compliant with her medications because of financial issues – and that her hospitalizations occurred while she was not compliant.

Evaluation of symptoms considers the persistence and intensity and effects of the claimant's symptoms. Evaluation of symptoms is a 2 step process. First, does the claimant have a medically determinable impairment reasonably likely to cause the complained of symptoms? Second, does the medical evidence, and then the other evidence support the claimant's reports of symptoms? Evaluation of symptoms necessarily calls for evaluation of the claimant's reliability and credibility.

The claimant does have impairments, including her poor circulation, which could reasonably be expected to cause her pain in her legs, with swelling – her phlebitis, and thrombophlebitis, which can certainly adversely affect circulation, and make circulation of lymph fluid less effective, causing swelling, which can cause pain by itself. And the claimant's weight can reasonably cause pain in all the supporting structures of her body–such as her legs. I have, however, already concluded the claimant has not shown any mental impairment as a current impairment, so I decline to consider her alleged symptoms of mental distress as reasonably arising from any impairment.

The medical evidence is equivocal as to supporting the claimant's reports. She does complain of these impairments, with complaints of pain, and with pain medications prescribed. But the claimant testifies that her hospital visits have occurred when she is not compliant with her medications, and I note some follow long automobile trips.

The claimant has no other treatments than medication for relief from her symptoms, and she has no other methods of seeking relief, save avoiding exertion and putting her legs up, to assist drainage of blood and lymph, and I no doubt other fluids, from them.

The other evidence is not helpful to the claimant. It is actually difficult to say what problems the claimant would have if she was consistently complaint with her treatment, and if she would lose weight, as she has been advised to do. I am fully aware that low finances can cause people to forego medications, and that medications are not generally available for free or at very low cost. Still, Texas does have a publicly funded medical care system, which the claimant does not seem to use; and medications come at subsidized prices through this system, or may be available through manufacturers' programs for the indigent. Accessing these systems may require ingenuity and persistence, and perhaps they are not as available in the Lubbock area where the claimant lived– but the claimant does not mention trying to obtain a Gold Card, which is the credential for publicly funded health care through the Harris County Hospital District since she moved to the Houston area.

Even crediting the claimant's reports and testimony about her symptoms, I consider I have adequately allowed for them in the residual functional capacity I have assigned for her. (Tr. 22-23).

As to Proctor's contention that the ALJ erred by discounting the August 20, 2011, form entitled "Treating Physician Opinion of Patient Limitations" (Tr. 737), and Letter dated December 14, 2011 (Tr. 815), the ALJ set forth a specific reason as to why the two statements were not controlling although probative. The ALJ considered the evidence in the record as a whole and the records from Dr. Addington's Clinic reveal that Proctor was seen by a physician assistant. The ALJ can give less weight to a treating physician opinion for good cause such as disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *Leggett,* 67 F.3d at 566; *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). Here, the two statements while probative were not persuasive given the inconsistencies between the two statements about Proctor's limitations and the treatment notes from the clinic, and the record as a whole.

At the hearing, Dr. Goldstein, testified as a medical expert after reviewing Proctor's record. Proctor contends that the ALJ erred when he failed to address the medical expert's opinion. The Commissioner counters that even though the ALJ failed to explicitly discuss the medical expert's opinion, the ALJ took the opinion into account and essentially adopted it in formulating Proctor's RFC, and that it was consistent with the conclusions reached by the two state agency medical consultants who like Dr. Goldstein did not examine Proctor but reviewed her record. In fact, all three non-examining physicians reached the same conclusion: Proctor could perform a limited range of light work. The Magistrate Judge agrees.

The failure of the ALJ to specifically mention Dr. Goldstein or his testimony is harmless because the ALJ's RFC determination tracks Dr. Goldstein's ultimate opinion about Proctor's RFC,

and was consistent with and corroborated by the opinions of the two other state agency physicians. Dr. Goldstein's observations about Proctor's de-conditioned state, did not take away from his ultimate opinion that Proctor could do limited range of light work. "The ALJ has the responsibility for determining Plaintiff's RFC and for making the credibility determination, and may choose whatever opinion is most supported by the evidence. He is not required to accept any medical opinion *in toto*, rather, his RFC determination is based upon the evidence as a whole." *Gray v. Astrue,* 1:09-CV-0101-BI ECF, 2011 WL 856941 at *5 (N.D.Tex. Mar. 11, 2011). Both state agency physicians and Dr. Goldstein agreed that Proctor was capable of performing a limited range of light work. Neither Dr. Goldstein nor the two agency physicians saw or treated Proctor. Their respective opinions relied on their review of the medical evidence that the ALJ also reviewed. Because the opinions of the state agency physicians were consistent with the evidence in the record, the ALJ properly considered their opinions in formulating his RFC determination. Substantial evidence supports the ALJ's decision that Proctor was not disabled and had the RFC for limited light work. Because substantial evidence supports the ALJ's RFC determination, any error by the ALJ in failing to explain why he did not explicitly mention Dr. Goldstein or the contents of his testimony in his decision is harmless. *See Taylor v. Astrue,* 706 F.3d 600, 603 (5th Cir. 2012); *Audler v. Astrue,* 501 F.3d 446, 448 (5th Cir. 2007)(stating that ALJ's omission does not require remand unless it affected claimant's substantial rights); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1998)("Procedural perfection in administrative proceedings is not required" as long as the "substantial rights of a party have [not] been affected."); *Denney v. Colvin*, 4:12-CV-565-Y, 2014 WL 169647 at *8 (N.D.Tex. Jan. 15, 2014)("The ALJ's decision is not subject to reversal, even if there may be substantial evidence in the record that would have supported the opposite conclusion, because substantial evidence also supports the conclusion reached by the ALJ."). As for Proctor's argument that the ALJ erred by not fully developing

the record by sending Proctor for a consultative examination, the ALJ is not required to order a consultative examination where the record contains sufficient medical and non-medical evidence upon which to base determination of disability. *Sims v. Apfel*, 224 F.3d 380, 381-382 (5th Cir. 2000). Here, because the record contained sufficient medical and non-medical evidence, the ALJ did not err in exercising his discretion and not ordering a consultative examination. The Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook,* 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames,* 707 F.2d at 166.

Here, Proctor testified about her health and its impact on her daily activities. She offered no testimony or corroboration from her family or friends with respect to her complaints about her condition. Proctor testified that she has a drivers license and drives. (Tr. 840). She stated she had worked for 23 years until 2005 and that it was her idea to stop working. (Tr. 842, 844-845). Proctor testified that she had been noncompliant with her medications due to financial reasons. According to Proctor, "I haven't been on Medicaid all that . . . long so had to pick and choose." (Tr. 847, 855). As for her daily activities, Proctor testified that she gets up in the morning with her 14-year-old daughter and gets her daughter on the school bus. Afterwards, she goes back to bed and rests most of the day. (Tr. 849). Proctor stated she does no housework, cooking, washing dishes, or yard work. She does laundry and vacuums, once a week. (Tr. 849, 850). In addition, Proctor states she goes to the grocery store but gets around by riding a scooter. (Tr. 850). She seldom attends church. (Tr. 350-351). According to Proctor, she watches television for entertainment and has no hobbies. (Tr. 850, 852). Proctor described her pain as a 4 or 5 out of 10. She added that the more active she is, the more pain she experiences. (Tr. 853). Proctor stated that her daughter assists her in bathing and dressing. (Tr. 854-855). As for her ability to walk, Proctor stated that she could walk "as long as I needed to, as long as I could stop every 10 minutes." (Tr. 857). Next, Proctor estimated that she could stand and sit for fifteen minutes, could lift 10 pounds. She further stated that she could not lift 20 pounds, could not climb stairs. She is also bothered by heat. (Tr. 858-959).

As discussed above, the ALJ discussed Proctor's credibility, in the context of formulating Proctor's RFC. His credibility determination and RFC determination are intertwined. Proctor argues that the ALJ erred by not separately assessing her credibility. The Magistrate Judge disagrees. There is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. The ALJ's credibility findings are closely and affirmatively linked to

substantial evidence. The ALJ found Proctor not fully credible. Accordingly, this factor also supports the ALJ's decision.

### D. Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Karen E. Neilson, a vocational expert ("VE"), at the hearing. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling,* 36 F.3d at 436.

The ALJ posed the following hypothetical questions to the VE:

Q: Let's consider an individual of the same age, education, and work experience as the claimant, said individual would be relegated to light work as defined by the commissioner, but further limited in the following manner: they would be limited to

only occasional walking and standing three to four hours total out of an eight hour day; also limited to occasional postural maneuvers, such [as] balancing, stooping, kneeling, crouching, crawling, and climbing; they must avoid concentrated exposures to fumes, odors, dust, gases, environments of poor ventilation, hot and cold temperature extremes; in addition to that they're going to need a sit/stand option, basically let's say about once an hour they're going to need to be able to change position and get up and move around; would an individual of that description be able to engage in any of the claimant's past work:

A. Well, they do a lot of sitting as a school bus monitor, they do a lot of riding, so I guess the school bus monitor, they do a lot of riding, so I guess the school bus monitor would qualify.

Q. Okay, so school bus monitor would be available under that?

A. Yes.

Q. Okay. Are there any transferability of skills under that hyotheti[ical]?

A. No, sir.

Q. Okay. Would there be other jobs an individual of that description would be able to perform?

A. Yes, that would fit the hypothesis such as a small products assembler----

Q. Oh, and let me instruct you we need to limit it only to the light jobs because of the claimant's medical condition, sedentary work would [be] unavailable to her because of the danger of increased clots and other problems like that, so if you're going to give me jobs see if you can limit those to the light jobs.

A. Okay.

*　　　　　　*　　　　　　*

Q. Okay, so we have small products assembler, copy machine operator, and office helper?

A. Yes, sir.

Q. Okay. Could you briefly summarize for me what's customarily expected by employers in terms of absences, routine rest break periods, as well as time on task expectations?

A. Absence, particular at the unskilled level, if you miss more than two and a half two

three days on a repetitive basis it would eliminate competitive employment. Breaks usually continue [phonetic] like 15 minutes in the morning, 15 minutes in the afternoon, with one half hour to 1 hour lunch break, depending on industry. Time on task must at least be 80 percent, some readings say 85 percent of the work day.

    \*       \*       \*

80 to 85 percent of the work day on a task or eliminates competitive employment.

Q. Okay, so would it be fair for me to say that exceeding any of these customary limits on a regular basis would eliminate not only the jobs you were previously discussing but all competitive employment?

A. Yes, that would eliminate all competitive employment.

Q. Are there any conflicts between your testimony and definitions in the Dictionary of Occupational Titles?

A. No sir. (Tr. 874-877)

Proctor's counsel declined the opportunity to question the VE.

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert. A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Proctor was not disabled. Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Proctor could perform work as a small products assembler, a copy machine operator, and an office helper because the type of work was consistent with her RFC. The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Proctor was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

**V. Conclusion**

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Proctor was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed. As such, it is

ORDERED Plaintiff's Motion for Summary Judgment (Document No. 18), is DENIED, Defendant's Motion for Summary Judgment (Document No. 16) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 5th day of December , 2014

Frances H. Stacy
United States Magistrate Judge